# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-1527WA

_____

| | |
|---|---|
| DHC Resort, LLC, | * |
| | * |
| Appellant, | * |
| | * On Appeal from the United |
| v. | * States District Court |
| | * for the Western District |
| | * of Arkansas. |
| Razorback Entertainment | * |
| Corporation and Jake Prince, | * |
| | * |
| Appellees. | * |

_____

Submitted: September 12, 2002
Filed: May 29, 2003

_____

Before BYE, RICHARD S. ARNOLD, and BEAM, Circuit Judges.

_____

RICHARD S. ARNOLD, Circuit Judge.


DHC Resort, LLC, brought this action against Razorback Entertainment Corporation and Jake Prince, its principal shareholder. DHC sued as assignee of Melvin Robinson, co-founder of Razorback with Mr. Prince. The principal relief requested is that Razorback and Prince be ordered to issue to DHC 49 per cent. of the stock in Razorback, stock that DHC contends that Mr. Robinson, its assignor, was entitled to. The District Court dismissed the complaint, holding that Robinson, because of his prior material breach of the contract between himself and Prince, had

forfeited any rights in Razorback. He therefore had nothing to assign to DHC. We agree with the District Court that Robinson failed to perform his contractual obligations fully, and that this fact should be taken into account in fashioning any relief that DHC might receive. We cannot agree, however, that Robinson's actions, which took place after the formation of Razorback as a corporation, worked a complete forfeiture of his property interest in Razorback stock. Accordingly, the judgment of the District Court, dismissing the entire action with prejudice, will be reversed, and the case remanded to that Court for further proceedings consistent with this opinion.[1]

## I.

The District Court's opinion clearly and fully sets out the facts. No one claims these findings are clearly erroneous. We therefore accept all of them.

Some time in 1999, Mel Robinson, the plaintiff's assignor, and Jake Prince, one of the defendants, made an oral agreement to purchase Belvedere Country Club from Telcor, Inc. The agreement included the following terms, among others. Prince and Robinson would form a corporation, Razorback Entertainment Corp., to make the purchase of Belvedere. Prince would own 51 per cent. of the stock of Razorback, and Robinson would own 49 per cent. The two men "would . . . share equally in the responsibility for the costs and expenses to be incurred in the ownership and operation of Razorback and Belvedere." Dist. Ct. Op., App. 22. It was agreed, in addition, that Robinson and Prince would pay in, as an initial contribution of capital, $2,500.00 each. These payments were made.

---

[1]In two respects, however, we agree with the District Court's order of dismissal. The claims for fraud, complaint ¶ 17, Appendix of Appellant (App.) 10, and for violation of federal and state securities laws, id. at ¶ 19, are deficient on their face. We do not believe these claims require extended discussion. Insofar as the District Court dismissed them, the judgment of that Court is affirmed.

On July 22, 1999, Prince and Robinson, acting for Razorback, the corporation they had agreed to form, entered into a written contract with Telcor for purchase of the Belvedere Country Club, including 620 acres, more or less, with a clubhouse, an eighteen-hole golf course, and other appurtenances. The corporation was legally constituted in August, 1999. Razorback was incorporated in Nevada on August 6, and received authority to do business in Arkansas on August 27, 1999. No stock in Razorback was ever issued, either to Prince or to Robinson, "but both men from time to time represented orally and through documents . . . that they were acting for the corporate entity, as either an owner, officer or authorized agent thereof." Id. at 23. On July 23, 1999, Prince and Robinson took over the management of Belvedere. They operated the Club, carried out renovations, solicited membership, and attempted to locate financing for the purchase.

During the remainder of 1999, both Prince and Robinson put money into club operations at Belvedere — Prince contributed $91,353.24, and Robinson contributed $30,953.98. Problems arose with the financing of the purchase of Belvedere by Razorback from Telcor. The relationship between Robinson and Prince began to decline. On December 31, 1999, some sort of altercation occurred between Prince and the construction manager supervising renovations to the Belvedere clubhouse. After that, Robinson never returned to the Club. Prince, left in possession, has operated the Club since that time.[2] Closing of the sale between Razorback and Telcor was scheduled for January 26, 2000, but closing did not occur. Telcor apparently asserted that it was no longer bound by the contract of sale. Litigation between Razorback and Telcor concerning the vitality of the July 22, 1999, contract of sale is pending in the Arkansas state courts. Razorback is in possession of Belvedere, but

---

[2]This statement speaks, of course, as of the time of the District Court's opinion, which was filed on February 6, 2002. What has happened after decision of the case by the District Court, we do not know.

-3-

no court has yet decided (again, we speak as of the time of the District Court's opinion) who in fact owns the Club.

## II.

Plaintiff's principal claim for relief — that defendants should be ordered to issue to it 49 per cent. of the stock of Razorback — depends upon the efficacy of Robinson's assignment to the plaintiff DHC of his interest in Razorback, whatever it was. The District Court held for defendants on the ground that Robinson never had any stock in Razorback to begin with, nor did he ever have a right to the issuance of stock. Whatever rights Robinson might ultimately have achieved, in the District Court's view, were extinguished when he committed a material breach of the oral agreement. Robinson's capital contributions became depleted through operating losses, and he refused to continue funding the project. Prince was left alone, saddled with the continuing burden of capital infusion as a result of Robinson's abandonment. Applying Arkansas law, the District Court noted that "[t]he party who first breaches a contract is in no position to take advantage of a later breach by the other party," Stocker v. Hall, 269 Ark. 468, 472, 602 S.W.2d 662, 664-65 (1980), if the breach is material and sufficiently serious. TXO Corp. v. Page Farms, Inc., 287 Ark. 304, 307, 698 S.W.2d 791, 793 (1985). "The Restatement of Contracts declares that an influential circumstance in the determination of the materiality of a failure fully to perform a contract is the extent to which the injured party . . . will obtain the substantial benefit that [he] reasonably anticipated." Id. at 308, 698 S.W.2d at 793; Restatement (2d) Contracts § 241 (1981). Because of Robinson's default, the Court reasoned, Prince never obtained the benefit that he reasonably anticipated, that is, equal participation by Robinson in the funding of the business. Accordingly, Prince was relieved of any obligation to Robinson, including the obligation to see that stock in Razorback was issued.

-4-

We respectfully disagree with this line of reasoning. In the first place, as we analyze the sequence of events, the first breach was committed by Razorback and Prince, not by Robinson. Once Robinson had made his initial contribution of capital, as agreed, he became entitled to the issuance of 49 per cent. of the stock. Razorback and Prince never fulfilled this obligation. There is no dispute between the parties that Razorback attained formal existence as a corporation. "Razorback Entertainment Corp." is a named defendant. The complaint alleges, in ¶ 2, App. 7:

> Defendant Razorback is a Nevada corporation having its principal place of business in Nevada but also doing business in Arkansas managing Belvedere Country Club.

The complaint also alleges, ¶ 9, App. 8, that "[d]efendant Razorback became a Subchapter S corporation . . .." The answer filed by Razorback and Prince admits these allegations.

It is true that Razorback had not yet achieved formal existence at the time of the contract for sale executed by Telcor and by Prince and Robinson on Razorback's behalf. This fact, it seems to us, is immaterial. Parties may agree to form a corporation and to contribute a certain sum as initial capital. They may further agree that this corporation will take title to property which they, on behalf of the future corporation, have agreed to purchase. That is what happened here. Prince and Robinson agreed to form Razorback, to contribute $2,500.00 each as an initial capital investment, and to cause the issuance of stock 49 per cent. to Robinson and 51 per cent. to Prince (the difference, apparently, being due to the fact that Prince would be mainly in charge of management). The corporation was formed, and the initial capital contributions were made by both men. The fact that stock was not issued is not material to the rights and obligations of shareholders. They still possess a property interest in the proportion agreed on, and they have a right to the issuance of stock to

-5-

evidence that interest. Ark. Code Ann. § 4-27-625; see also Biscoe v. Tucker, 11 Ark. 145, 147 (1850) (even absent possession of stock certificates shareholders have a property interest in the corporation). A person who has paid for stock becomes a stockholder whether or not certificates are ever issued or delivered. See Agricultural Fin. Corp. of Blytheville v. Brinkley, 188 Ark. 951, 954, 68 S.W.2d 92, 93 (1934).[3]

Thus, when Robinson made his initial contribution of capital, he became the owner of 49 per cent. of the shares in Razorback. Thereafter, Razorback, acting through Prince and Robinson, took possession of the Club and began managing it. In this way, Razorback ratified the contract for the purchase of the Country Club. See, e.g., Brace v. Oil Fields Corp., 173 Ark. 1128, 1131, 293 S.W. 1041, 1043 (1927) (indicating that a company becomes bound by a contract made by its promoters by ratifying the contract.) As further evidence of this ratification, we note that Razorback has sued the previous owner of the Club for the performance of the sale contract.

Certainly it is true that Prince and Robinson, in their initial agreement, undertook further obligations; in particular, they agreed that they would "share equally in the responsibility for the costs and expenses to be incurred in the ownership and operation of Razorback and Belvedere." Dist. Ct. Op., App. 22. The

_____

[3]In their briefs to this Court, the parties assume that Arkansas corporation law applies. We have made the same assumption in this opinion, but we question its validity. Razorback was incorporated in Nevada. It seems, therefore, that matters of corporate existence and the issuance of stock should be governed by Nevada law. It does not appear, however, that Nevada law differs from Arkansas law in any respect material to the present case. See Nev. Rev. Stat. § 78.235 (2002) ("every stockholder is entitled to have a certificate, signed by officers or agents designated by the corporation for the purpose, certifying the number of shares owned by him in the corporation"); § 78.030 (2002) (describing the formalities necessary to create a corporation).

issuance of the stock, however, was never conditioned on the parties' performance of this separate undertaking. Prince may well have an action against Robinson for breach of this portion of the contract, but we do not see how this breach can have the legal effect of destroying Robinson's previously acquired property interest in Razorback stock. We do not even know whether these additional contributions were to be in the form of debt or equity.

Perhaps, given the vagueness of the parties' arrangements, it would have been open to the District Court to hold that Robinson's proportional ownership in Razorback should be reduced on account of his failure to make the additional contemplated contributions. The District Court, however, did not take this path. It did not even give Robinson any credit for the approximately $30,000.00 that he did contribute.

III.

In our view, DHC, as assignee of Robinson, was entitled to an order requiring Razorback to issue to it 49 per cent. of Razorback's stock, and requiring Prince to do everything necessary to cause Razorback to take this action. That would not necessarily be the end of the matter. As we have indicated, Prince would be free to sue Robinson for breach of contract, and Razorback itself would also have standing to bring such a claim, on the theory that by acquiring the Club it had ratified the initial agreement between the parties. In addition, if the agreement about making additional contributions to the corporation is taken to refer to contributions of equity, Prince could well be entitled to some sort of equitable adjustment in the percentage of shares properly owned by DHC. It might be, for example, that if Prince has contributed roughly 75 per cent. of the equity, and Robinson only 25 per cent., the ownership of shares should be adjusted accordingly, in order to carry out the intention of the parties in their initial oral agreement. We leave these matters for determination by the District Court on remand.

The judgment of the District Court is affirmed in part and reversed in part, and this case is remanded to that Court for further proceedings consistent with this opinion.

BYE, Circuit Judge, concurring in part and dissenting in part.

DHC's complaint asserts six claims for relief. The district court dismissed each with prejudice. This court affirms the dismissal of two of the claims as deficient on the face of the complaint, but otherwise reverses the decision below. I would affirm the district court in its entirety; I therefore respectfully dissent.

I agree with the district court: corporate law is not applicable. Razorback did not exist at the time Prince and Robinson purchased and began operating the Belvedere as general business partners. There is no evidence Razorback ever acquired possession, ownership, control or management of the Belvedere. There is also no evidence of Razorback conducting an organizational meeting to elect directors or officers, adopt bylaws, or authorize the issuance of capital stock. Likewise, there is no evidence Prince and Robinson ever assigned their interests in Belvedere to Razorback. Therefore, while the majority is correct in concluding Prince and Robinson were able to acquire property the contemplated corporation, to be later formed, could obtain title to, there is no evidence title was ever transferred from either Prince and/or Robinson as general partners to Razorback, the contemplated, but unorganized, corporation. Consequently, Prince and Robinson always conducted the business of the Belvedere as general business partners by virtue of their written agreement with the prior owner, irrespective of the interests the two men may or may not have had in the yet to be organized corporation they were in the process of forming.

As a consequence, contract law, not corporate law, is determinative of the outcome of this dispute as the district court ruled. In the future, either partner could

commence a partition action for an accounting and determination of how the remaining net assets, if any, of the partnership are to be divided should either partner be so inclined. Regardless, the decision of the district court in the present litigation is ripe for affirmance. Because the majority concludes otherwise, I respectfully dissent.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.